J. N. RAMSEY, TRUSTEE FOR GEO. L. SCHOONOVER, AMELIA L. SCHOONOVER, HELEN L. SHAW, F. O. ELLISON, W. A. CUNNINGHAM, M. CHAPLIN, and PARK CHAMBERLAIN, Appellees, v. W. M. WELCH COMPANY, W. M. WELCH, H. M. REMLEY, W. A. CUNNINGHAM, CHAS. HOLMES and D. DUPUIS, Appellants.

W. M. WELCH COMPANY (American Educational Industries), Appellants, v. GEO. L. SCHOONOVER, and PARK CHAMBERLAIN, Appellees.

Corporations:  ISSUANCE OF SECURITY FOR BENEFIT OF DIRECTORS.
1  Where a corporation became involved and the directors advanced
their individual funds to meet its obligations and thereafter issued
bonds secured by a trust deed covering the corporation property, as
security for the obligations of all creditors without preference, and
the holders of the bonds paid, or permitted to be paid, all other
debts of the corporation, the fact that the bonds were issued in part
for the protection of the directors under a resolution of the corpora-
tion passed by them did not render the bonds and trust deed void;
as the fairness and good faith of the transaction was apparent and
the directors gained no advantage, which a court of equity would
not have granted under a showing of the facts had the bonds and
trust deed not been issued.

Same:  CHANGE OF NAME:  INJUNCTION.  Where the rival directors of
2  a corporation gained control of the same, and the only apparent
reason for changing its name was to aid another organization simi-
larly engaged, and in which the controlling directors were interested,
and it was apparent that the change in the name would injuriously
affect the corporation, an injunction restraining the change was
properly granted.

Same:  FRAUD:  EVIDENCE.  In this action for the alleged mismanage-
3  ment of the corporation by the directors the evidence is reviewed
at length and held to show fraud, neglect and misconduct.

Same.  The fact that one stockholder purchased stock from another
4  with a view of gaining control of the corporation, agreeing to pay
for the same in partial payments until the same was paid for or
the stock returned, and that he held and voted the stock for a time
when he returned it, did not render the transaction fraudulent.

Injunction:  APPEAL:  RIGHT TO ALLEGE ERROR.  The fact that defend-
5  ants named in the title of an action, who were neither served with
notice nor appeared to the action, were injoined by the decree, was
not a matter of which a co-defendant could complain on appeal.

*Appeal from Jones District Court.*—HON. MILO P. SMITH,
Judge.

SATURDAY, DECEMBER 13, 1913.

THE two actions above named were tried in the court
below upon the same testimony, and are submitted here upon

one record. The first is a proceeding to foreclose a trust deed against the defendant corporation. The second is an action by the corporation for damages and for an accounting against the defendants Schoonover and Chamberlain for alleged fraud and mismanagement of the affairs of the corporation. Both actions were brought and tried on the equity side. There was a decree substantially as prayed, for the plaintiff in the first action and for the defendants in the second. From such decrees, the corporation has appealed in each case. *Affirmed.*

*Dawley & Wheeler, Remley & Remley,* and *J. R. Long,* for appellants.

*Jamison, Smyth & Hann, Barnes & Chamberlain,* and *C. B. Paul,* for appellees.

PER CURIAM.—The W. M. Welch Company is an Iowa corporation doing business at Anamosa. It was organized in the early part of 1903, and commenced doing business on May 1st of that year. The general nature of its business was to publish and deal in school supplies. Its chief promoter was W. M. Welch, who was a former resident of Anamosa, and who for many years next prior to 1903 had been engaged in the same line of business in Chicago in connection with a partner, one Brown. The company was organized with a paid-up capital of about $154,000. On this capitalization, $100,000 of common stock was issued to Welch and Brown for the good will and assets of their previous business. $54,000 of preferred stock was issued to citizens of Anamosa in pursuance of their subscriptions for like amount and payment therefor at par. Welch was selected as manager at $5,200 per year. In 1905 some dissatisfaction and friction developed. Expert accountants were employed to examine and report upon the condition of the company. This report, made in July, 1905, was unfavorable in many of its

features. It showed a net loss of approximately $10,000 in the two years of operation. The company had become indebted also in large sums for borrowed money, and was embarrassed by its inability to pay. Such money was borrowed in the first instance from the First National Bank of Anamosa. The bank required that this indebtedness should be assumed by the directors and other stockholders. These executed their notes to the bank for various amounts for such indebtedness, and respectively took the notes of the corporation to themselves for like amounts. At a meeting of the directors on December 21; 1905, the resignation of Welch as manager was required and received, and Geo. Schoonover was selected as manager at a salary of $200 per month. The control of the company adversely to Welch was accomplished by the co-operation of Brown with his common stock and the Anamosa residents with their preferred stock. On this date of the change of management the outstanding indebtedness due of the corporation amounted to about $54,000. No part of this indebtedness was ever paid, and this is the indebtedness involved in the first entitled action. In February, 1906, the company through its directors funded the greater part of this indebtedness by issuing bonds to the extent of $50,000; one series of $5,000 to fall due January 1, 1907, another series of $5,000 to fall due July 1, 1907, and the remaining $40,000 to fall due January 1, 1911. A trust deed was executed to secure such bonds. These bonds were then exchanged with the creditors of the corporation for past-due notes of a like amount. Such creditors were all directors or stockholders who had advanced their money with a view to keeping the corporation a going concern. The company continued to do business, and continually lost ground, though always hoping for a better turn. The company maintained a Chicago office from the beginning of its organization. If we understand the record correctly, the function of this office was that of a selling agency. It maintained the communication with the purchasing trade. Welch. organized a rival

company in Chicago under the name of "W. M. Welch Manufacturing Company." He waged a bitter warfare by circular letters and otherwise upon the Anamosa company, and greatly injured its business beyond all question. In February, 1911, Welch, having obtained control of the Brown common stock, appeared at the annual meeting and elected a board of directors hostile to the existing management and to the preferred stockholders. The new board of directors adopted a resolution changing the name of the corporation and substituting for its former name the name, "American Educational Industries." Thereupon the first entitled action was brought to foreclose the trust deed. It was also alleged in the petition that the adoption of the change of name was done fraudulently, and for the fraudulent purpose of injuring the corporation and its preferred stockholders, and for the purpose of giving advantage to the rival corporation. An injunction was prayed, restraining such change of name, and this relief was granted in the decree. At the time this suit was instituted the corporation had become wholly insolvent, and none of its stock, either common or preferred, has any value; the property being insufficient to pay the bonded debt.

The defense is made in the first action by and for the corporation as such. The defense is put upon the ground that the bonds and the trust deed were wholly void because

1. Corporations: issuance of security for benefit of directors. they were made in part for the benefit of the directors as creditors, and that such directors were therefore wholly disqualified to act for the corporation in such regard. The contention is that the bonds and the trust deed are wholly null and void, regardless of any question of fraud, and regardless of any merit or equity upon which they may rest. The legal question thus raised is involved in some conflict of authority. The rule adopted in an early day in this state is adverse to appellant's contention. *Garrett v. Burlington Plow Co.,* 70 Iowa, 697; *Hallam v. Indianola Hotel Co.,* 56 Iowa, 178. The rule thus announced is that such transaction will be scrutinized closely,

and that the directors will be held strictly to fair dealing. In the case before us, the fairness and the equity of the transaction is beyond debate. The bonds and the trust deed stand for the security of all creditors without preference; the holders of the bonds having paid or permitted to be paid all other debts of the company. The bonds and the trust deed confer upon them no greater right or remedy than a court of equity would award to them upon the facts shown if there were no bonds or trust deed. The control of the corporation by the present management seems to have no other purpose to subserve than to increase the loss of these creditors without any hope of advantage to any stockholder as such. We have no hesitancy, therefore, in holding that the trial court properly sustained the trust deed, and properly awarded a foreclosure.

On the question of the change of name, neither the record nor the arguments put forth any reasonable explanation of the purpose of such change. We are satisfied that there is no reason therefor which is consistent

2. SAME: change of. name: injunction.

with the interests of the corporation. Under the powers of the trust deed the trustee has been in possession and operating the plant. In such way stock on hand may be disposed of advantageously through the channels of trade. The benefits of previous advertising may be thus utilized. We cannot escape the conclusion that the change of name was intended as another blow to the corporation, and that the only advantage contemplated was such as should inure to the rival corporation. The decree was proper in this respect.

Turning to the second entitled action, the claim for damages against Schoonover and Chamberlain is based almost wholly upon the testimony of Welch. It is voluminous, and we can set forth only brief portions thereof.

3. SAME: fraud: evidence.

Schoonover was one of the stockholders and directors. He was active in the removal of Welch as manager. He succeeded him as manager at a reduced salary.

So far as this record shows, he seems to have done his utmost for the salvation of the company, though it was all without avail. After the first few months of his management he relinquished all claim to salary. In appellant's argument particular stress is laid upon the following portions of Welch's testimony.

Mr. Schoonover said to me: 'While you were gone they put this up to me.' I said: 'What is it about?' He said: 'Read it.' I read it, and it was this petition referred to by Judge Remley, asking for an investigation of the company's accounts, etc. 'Well,' I said, 'that is all right.' I laughed about it. I said: 'Let them investigate,' but who is going to pay for it?' He said: 'I don't know.' I said: 'If they will pay for it, let them go ahead.' I said: 'Why don't they take the report of their own bookkeepers?' They are just as much to them as they are to me. Their own bookkeepers in Chicago there. This typewritten paper, consisting of two sheets, attached to page 55 of the record book, purporting to be the records of the meeting of the W. M. Welch Company, is the document they showed me. Well, they went ahead, and Mr. Schoonover employed this firm of expert accountants to examine the books, and they spent six weeks, and made an examination of all the books in Chicago, and accounts running back to the origin of the company, and at Anamosa. The bookkeepers came to me and wanted to know the value of certain things, and I said: 'I don't think it is proper for me to tell you the values, for the reason that I have already reported my ideas of the values, and I am afraid that after you get your report made it would be another Welch report, if I give you the values, but I will instruct the superintendent of the printing department to give you all the values according to his ideas, as far as he knows, and the superintendent of the wood department, and the foundry likewise, and if there is anything you want, come to me, and I will try to help you out, but I don't want to place values, since you are employed by the company as unbiased expert accountants.' They said that would be satisfactory, and they went ahead and got out their report. I knew nothing of it until one day Miss Lou Shaw came down and said: 'I have good news for you.' I said: 'What is it?' She said: 'The expert accountants have

made their report, and it is lots more promising than any report you have ever made, and the board of directors are going to get your stock subscribed all right.' I said I was glad to get some good information somewhere. The accountants were about six weeks working on their report, in June and July, 1905, I think. It might have been May and June. The accountants were Rickett and Williams. Their bill was $1,000, but it was cut down to $900 and something, and we had to pay it. George Schoonover led me to think that he didn't know anything about this petition for the examination. I was not present at the board meeting, which ordered the accounting. It was done in my absence.

The business began to show us annoyance about the time the auditing of the books came up. The examination of the book accounts made us a lot of trouble, both here and in Chicago. Of course, not a large item, but still it was, it caused trouble; set stories to going around; you could see it in the help; and it began to breed suspicion and insubordination. I could feel it in every shop. Up to that time the business was all harmonious and successful and profitable. Preceding that year with all its troubles our business showed a profit of something over $10,700 for the year 1904. The business was going along profitably up to the time of the bookkeeping investigation. I made periodical efforts with the board and the committee to obtain the subscription of the remaining $44,500 of the preferred stock. I didn't go to the people. I never considered I was responsible in the matter of that subscription, because I never asked the people to subscribe. I felt that was up to the people of Anamosa to make good with me, according to the vote passed in this room, and the agreement of their committee representing them that they should get that stock subscribed, so I made representations to the board and to the committee time and again. They put me off from time to time, and I ran the plant on my own credit for about a year, with very little assistance from Anamosa, with no assistance for operating. The only money they put up was what they were putting in the buildings. I continued to run the plant with this extended pay roll, and this extended line of sales on my own credit.

Mr. Schoonover decided that he wanted the checks countersigned for some reason. I had been signing those checks then for over twenty-five years, after the manner that I have

stated here, the accounts all being O. K.'d. And it struck me as queer and unusual proceeding. Besides I was authorized by the by-laws of the company to sign the checks, and as the order was contrary to the by-laws of the company, and it was a bit of indignity to me, as I was supposed to be the manager of the company, and the founder of it, and had been with it for a quarter of a century, I felt that such an order as that, coming from this young man, was an indignity, being contrary to the by-laws and contrary to the custom of our business, and useless and simply a thing that I supposed he thought was in accordance with metropolitan business, and all that sort of stuff. I objected to it, and there was a little friction for a few days. Some checks were signed and sent up there, and I believe they were cashed at the bank, and I thought the matter would blow over, but a check came back to me one day that was presented and they wouldn't pay it; a small check of $4, and the matter was made an issue. Mr. Schoonover wrote a letter both to this office and to the Chicago office of December 7, 1905. The board had an informal meeting, and I took the matter up with them. Mr. Schoonover wasn't present. They wanted to know why I objected, and I told them substantially what I say now, and that it was an indignity, unnecessary and contrary to the laws of the company. I pointed out that clause authorizing me to sign the checks. The old colonel said he thought that George had his heart set on it, and wanted to know if I couldn't do it to keep peace in the family, or something to that effect. The upshot of the matter was, I said 'that is a mere bagatelle compared with the interest at stake, and I will let the checks be countersigned.'

This meeting was in accordance with the call referred to in the letter of the 16th about the board meeting. Col. Shaw said the matter of checks had already been adjusted, and we didn't need to waste any time on that. The advisability of an auditor in the Chicago office was discussed. They passed a lot of these little details before they came up to the real object of the meeting. Mr. Schoonover said he guessed that it was up to him now, and he pulled out a typewritten list of charges against the general manager, which he read, and one by one discussed, in which he went on to say, or to show, to the board my unfitness for the position of manager of the company that I had organized and built up for twenty-five years. He discussed that matter up until the noon hour. We

adjourned for dinner. I noticed, during the forenoon, a difference in all these gentlemen from any time that I had met them before. I couldn't account for it. The undercurrent was on. Something peculiar in the attitude of the old colonel and Mr. Dutton, now passed away. I was thinking it over when I went to dinner on the hill, where I lived, and all at once the thought occurred to me, Mr. Schoonover had been down to see Mr. Brown. Mr. Schoonover has perhaps gotten that call for a meeting which I had sent to Mr. Brown. Mr. Schoonover has laid his lines. I expected to bring that before the board myself, but he had gotten it from Brown. The whole thing was revealed to me at that time, that he was undermining; that he was laying the wires to get me out of there. I could see it almost as plain as if it were written. I came back after dinner to the board meeting in the bank, and it was resumed. Mr. Schoonover then moved that we consider the resignation of the general manager, and he discussed this various list of typewritten charges, among which was that I had too close supervision over my superintendents in the various departments; that I was down in the wood shop or over in the factory when I should be up in the tower as general manager. When he got through and preferred all his charges, I said to the board: 'Let's admit that everything he says is true, and what of it?' They hung their heads, as men would who were accustomed to business dealings. I said to the gentlemen there: 'I have an idea of something that I didn't know this forenoon. I want to be frank with my business associates. Mr. Schoonover, you have been to see Mr. Brown?' 'Yes.' 'You have gotten a copy of a certain paper that I sent him to sign to present to the board of directors?' 'Yes.' 'You brought it up clandestinely and showed it to the various directors, without letting me know about it?' 'Yes, sir.' Whatever else he may have said to them at the same time I don't know to prejudice them against me. That was the first stroke. I pulled from my pocket the letter from Mr. S. A. Brown, asking me to send this, so that the whole thing might be brought before the board. The little scheme was fairly falling flat. The board saw that they were hoodwinked. . . . I handed the letter I had received from Mr. Brown asking me to call the meeting that way, and handed it to Henry Dutton, and told him to read it to the board. He read it to the board then. Mr. Dutton read it, and Mr. Schoonover heard it.

It was hard for Mr. Schoonover to manage the board then, and the day wore on. Now and then he would say: 'I move my motion,' but there was nothing doing. The old colonel was the man to get in that instance. While nominally we had a board of directors, yet these directors were Col. Shaw of that bank, Mr. Schoonover of that bank, one Henry Dutton, a nephew of Colonel Shaw. Mr. Cunningham says he never had any interest in the W. M. Welch Company, except to do as Mr. Schoonover told him, and to take the place of Mr. Niles, who resigned from the board of directors. I mention this because that board of directors was a unit so far as preferred stockholders were represented or their representations were concerned. If Mr. Schoonover could get the old colonel his way, of course he could get Henry Dutton, and of course he could get William Cunningham, no question of that, and so the talk really all day was to get the old colonel, an old man between 80 and 90 years old, feeble, bed-ridden for a time, blind, and unable to walk, except with two men, one on each side of him. This was the man that he was trying to get his way. They couldn't get any vote from anybody else, so they pulled and hauled with him. Mr. Dupuis was there. He was one of the directors. They pulled and hauled all the afternoon, trying to get the old colonel. He finally made some suggestion to postpone it, and let me run on a while. The day wore by, and dusk was coming on. Mr. Schoonover and Mr. Myrick took the old colonel out of the meeting into the bank, and labored with him for about twenty minutes, and then brought the poor old fellow back to the door. Mr. Shaw said: 'Mr. Schoonover and Mr. Myrick have been talking with me about the condition of things, etc., and I guess I will have to vote "Aye."' and he dropped his chin on his chest, and asked for assistance and walked out. That was the end of the meeting practically. They recorded the vote in favor of my resignation on the part of Mr. Cunningham, Mr. Schoonover, Mr. Shaw, and Mr. Dutton, and they recorded Mr. Dupuis' and my vote against it. By what Mr. Schoonover said there that day, they had a gentlemen's agreement that he had with Mr. Brown that he would get Mr. Brown's support at the next annual meeting. That is the only thing that would justify him in taking this rash action, was the assurance from Mr. Brown that he would have the support of Mr. Brown. Mr. Brown himself didn't face the music, and was absent.

That ended the day's doings. After the close of this board meeting, I got an order from Mr. Cunningham to deliver everything over to Mr. Schoonover, the keys, all the property, and everything. I did this.

· The foregoing is fairly illustrative of more than 200 pages of his testimony. Upon much of this testimony the witness puts the following interpretation:

After I was put out of the office of manager, they did not have a manager or foreman or superintendent who had my experience. The astonishment among business men here that are in business and in Chicago who knew about that line of business was expressed on every hand that a metropolitan plant like this should be juggled in the way that it was. You can't get a man to manage a business like that—you can't hire them—you have to make them. They did not at any time have a manager who had any experience in educational work or informed in school work. The men they put in were not even school men from an educational side of it, and I say this without any disrespect to the gentlemen. I think I could say the same of Judge Remley or Mr. Dawley or my brother Jamison, without disparagement. It would be absurd that any of these gentlemen with all their experience should attempt to manage a plant like that. I couldn't hire a man to do it. I had to make him. I had to do it always. You have to take a man in. This man that I depend on now has been with me seventeen years, and he is a part of the business, as much as the machinery, and capital stock, and everything else. I had to make him. You have to make everybody in every business. That is one of the charges brought out to the board of directors by the way.

The Court: Let me see if I understand you right there, Mr. Welch. In speaking about the peculiar talent and training that these men require to run an institution like this. Was that a portion of your answer to the question by Mr. Dawley as to these managers being proper from an educational point of view? And when you observed that they were not, and then made reference pleasantly to counsel here—was that in answer to his question that they were not fit from an educational point of view?

A. That is what I meant, your honor, in that this is

largely—the education required there is largely—touching didactics, getting letters that will reach superintendents of schools in reference to that particular line of work, and particularly the items we had to sell them.

The Court: Do I understand that the training you give these men was to take the place and be superior to what is regarded as a thorough college education?

A. Yes, your honor, that is what I intended. A thorough college education would be a great help; but, as I said in the first part of my examination, I took a special course in didactics along the line of teaching. A man to be in our business has got to know a considerable amount about teaching school and superintending school, not only in the city, but also as a county superintendent, so as to know about the usefulness of all these different items and their application, and why they ought to buy them, and the argument to put up to show they are a good thing. That is only part, your honor, from the educational side; that is only part of it. . . . I have devoted my life to acquiring knowledge of this business in all its departments. There are very few men who by reason of their study, education, and training that would be capable to accept the position of general manager of a plant like this and operate it successfully. There are none, only the ones you make. . . . Q. That in respect to Mr. Schoonover or Mr. Chamberlain or any one else, that they could get, however devoted to the business, or however attentive they might have been, they couldn't have successfully managed the plant? A. Without experience in—without this technical experience. Q. This took experience acquired only by long time and practical study in the conduct of the business, and the personal element? A. Yes, sir. Q. *Then the failure of this plant here in Anamosa to be successful, you regard as due wholly to your discharge as manager?* A. *Yes, practically; that is the principal thing.* Q. You don't mean to charge Mr. Schoonover or Mr. Chamberlain with lacking in any respect in giving the matter personal attention, or anything of that kind? A. Well, that necessarily is in the question itself. If they didn't know anything about it, which I admit, and stated, it didn't matter so very much how much attention they would pay to it. You might say the same thing of a hodcarrier trying to direct an orchestra. Q. Whatever they might do, or attempt to do, in bringing to bear upon this business, general business experi-

ence, couldn't have saved the plant, without the possession of
the peculiar knowledge which you have acquired over the
twenty-five years of experience you have had, as I understand
it? A. They could have done something, yes. They could have
educated men up to it before they turned me out; after they
turned me out, they could not. *The error was committed at
the time the so-called board of directors discharged me from
the plant.* . . . Q. You knew at the time you sent those
out that the result of your acts and conduct in starting that
plant and in sending out those circulars would cause a loss to
the Welch Company at Anamosa? A. I answer that always—
yes. Q. If there were losses then to the Welch Company at
Anamosa, they were due largely, if not wholly, to your acts
and conduct in starting the Welch Manufacturing Company
in Chicago and circularizing the country with your literature?

Mr. Dawley:  Objected to as calling for inferences and
the conclusion of the witness, and not cross-examination, and
immaterial.

The Court:  That is over-ruled; answer it.  (Question
read.)

A. No, they were not due wholly to it, they were due
partly, of course. Q. Taking the two of them together, Mr.
Welch, your leaving the company and then your organizing
the other company, are the two elements, are they not, in
your judgment, for bringing about the losses in the Welch
Company at Anamosa, if losses there were?

Mr. Dawley: The same objection.

The Court: The same ruling; answer it.

A. That would be largely true, I think. . . .
Q. You don't mean, Mr. Welch, in this case at this time, to
charge any negligence or want of attention to these parties
to either Mr. Chamberlain or Mr. Schoonover in the conduct
of the Welch plant, do you, other than an error and mistake
in the selection of a manager? A. Yes, I charged a good
many things; I would charge the losses of things to them if
I were making charges. Q. In the claim now that you are
asking against them, there was nothing they could have
done, was there, except to go back and retract the error of
the board in discharging you?

Mr. Dawley: The same objection as last above.

The Court: The same ruling.

A. I think they could have done better; I think they

might have done better. Q. They might have exercised better discrimination in the selection of men? A. Yes, I think they might have done a whole lot better in many ways. Q. You stated to us yesterday that there was no lack of attention of the efforts on the part of Mr. Schoonover or Mr. Chamberlain, and that neither one of them, by whatever amount of attention they might have given—it wouldn't have avoided the losses after the mistake was made in the managers? A. One thing I did state there, one thing I didn't state—I didn't say there was no lack of attention on their part, but I did say if they had given their full attention to it, they would be incompetent to handle it. There wasn't either one of them competent to do it.

The foregoing quotations are sufficient to show the general nature of the evidence in support of the claim for damages. It is entirely wanting in specification of fact. It consists wholly in alleged intuitions and moral convictions of the witness, and perhaps in a large and educated sense of the extreme and peculiar qualifications needed in the manager of such a corporation. No defendant could interpose direct proof in denial of such evidence. It may furnish a persuasive reason why the change of management should not have been made, but it does not show any fraudulent mismanagement on the part of the new manager.

The evidence against Chamberlain is even more indefinite than that against Schoonover. No ground of recovery is proved against either defendant.

Some stress is laid in argument upon the claim that Schoonover obtained control of the company in 1905 by a fraudulent arrangement with Brown for the possession of his common stock and the voting of the same. It is made to appear that Schoonover purchased an option on Brown's stock at $200 per share, and that he agreed to pay him therefor the sum of $100 per month until he executed the option or returned the stock. He held the stock for six months and returned it. The contract disclosed no fraud on its face. No other evidence was

4. SAME.

introduced to show that it was fraudulent in fact. Schoonover made no other use of the stock than Brown could have done. Brown never complained of such use, but acquiesced therein for many years. We see little materiality in the fact contended for from any point of view.

Lastly it is urged that the injunction of the trial court was directed against defendants named in the title, but who were never served with notice, and who did

5. INJUNCTION: appeal: right to allege error.

not appear. If such be the case, the appellant herein is in no manner aggrieved by it, and has no occasion to become advocate for its codefendants.

The decree entered below in each case is therefore *Affirmed*.

WEAVER, C. J., LADD, EVANS and PRESTON, JJ., concur.